UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
ALBUQUERQUE DIVISION


UNITED STATES OF AMERICA,      )     CASE NO: 1:21-MJ-00170-KK
                               )
              Plaintiff,       )          CRIMINAL
                               )
       vs.                     )      Albuquerque, New Mexico
                               )
JOE D. CISNEROS,               )      Monday, February 8, 2021
                               )
_____Defendant._____  )      (11:04 a.m. to 12:12 p.m.)


PRELIMINARY EXAMINATION / DETENTION HEARING

BEFORE THE HONORABLE KIRTAN KHALSA,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:              RUMALDO ARMIJO, ESQ.
                           U.S. Attorney's Office
                           201 3rd Street NW
                           Suite 900
                           Albuquerque, NM 87102

For Defendant:             JOE M. ROMERO, JR., ESQ.
                           Romero & Winder, PC
                           P.O. Box 25543
                           Albuquerque, NM 87125

U.S. Pretrial/Probation: S. Day

Court Reporter:            Recorded; ABQ-Zoom

Clerk:                     E. Hernandez

Transcribed By:            Exceptional Reporting Services, Inc.
                           P.O. Box 8365
                           Corpus Christi, TX 78468
                           361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

### INDEX

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| BRYAN SANTIAGO-PAGAN | 4 | 20 | -- | -- |

**ARGUMENT RE PROBABLE CAUSE**

| | |
|---|---|
| BY MR. ARMIJO | 28/30 |
| BY MR. ROMERO | 29 |

**ARGUMENT RE DETENTION**

| | |
|---|---|
| BY MR. ARMIJO | 33 |
| BY MR. ROMERO | 36 |

**RULINGS**

| | |
|---|---|
| RE PROBABLE CAUSE | 32 |
| RE DETENTION | 39 |

1     **Albuquerque, New Mexico; Monday, February 8, 2021; 11:04 a.m.**

2                              **(Remote appearances)**

3                              **(Call to Order)**

4          **THE COURT:**  All right.  We're on the record in *United*

5     *States of America versus Joe Cisneros.*  Please enter your

6     appearances.

7          **MR. ARMIJO:**  Rumaldo Armijo on behalf of the United

8     States.

9          **MR. ROMERO:**  Your Honor, Joe Romero on behalf of

10    Mr. Cisneros.  And I just want to get a mike check.  I have

11    grandkids running around the house here.  So I have a headset,

12    Your Honor.  Can you hear me?

13         **THE COURT:**  Yes.

14         **MR. ROMERO:**  Okay, thank you.

15         **THE COURT:**  Good morning to you.

16         And good morning, Mr. Cisneros.  Can you tell me your

17    name, sir?

18         **THE DEFENDANT:**  Joe Cisneros.

19         **THE COURT:**  All right.  Mr. Cisneros, we are

20    scheduled for a preliminary hearing and detention hearing.  I

21    have a signed Waiver of Personal Presence at today's hearings.

22    Did you sign this document freely and voluntarily?

23         **THE DEFENDANT:**  Yes, I did.

24         **THE COURT:**  And do you consent to proceed with your

25    preliminary hearing and detention hearing by video today?

4

1          **THE DEFENDANT:**  Yes, yes.

2          **THE COURT:**  Okay.  All right.  If the Government

3   would call its witness.

4          **MR. ARMIJO:**  Yes, we call Officer Bryan Santiago-

5   Pagan.

6          **THE CLERK:**  Please raise your right hand, sir.

7          **BRYAN SANTIAGO-PAGAN, GOVERNMENT'S WITNESS, SWORN**

8          **THE CLERK:**  Okay.  Please state your name for the

9   record.

10         **THE WITNESS:**  Bryan Santiago-Pagan.

11         **MR. ARMIJO:**  May I proceed, Your Honor?

12         **THE COURT:**  You may.

13                    **DIRECT EXAMINATION**

14   **BY MR. ARMIJO:**

15   Q    What is your occupation, sir?

16   A    I work with the 377th Security Force Squadron as a base

17   patrolman.

18   Q    Okay.  And are you law enforcement?

19   A    Yes, I am.

20   Q    And where are you stationed?

21   A    At Kirtland Air Force Base, Albuquerque, New Mexico.

22   Q    Okay.  And what are your duties and responsibilities?

23   A    Duties and responsibilities are protect personal property,

24   enforce traffic enforcement, provide security for most of the

25   base.

1    Q    Okay.  And part of your duties include conducting

2    investigations as to misdemeanors and felonies?

3    A    Yes, sir.

4    Q    How long have you been in your current position?

5    A    I've been stationed here and working for the Security

6    Force Squadron since August 2017.

7    Q    All right.  Now, in the course of your duties, did you

8    have occasion to come in contact with Mr. Joe Cisneros?

9    A    Yes, I did.

10   Q    And is he appearing by way of Zoom today?

11   A    Yes, he is.

12   Q    And could you please just describe what you observe of him

13   for the Court?

14   A    He's wearing a yellow mask and a brown shirt.

15   Q    Okay.

16         **MR. ARMIJO:**  Your Honor, may the record reflect he's

17   identified Mr. Cisneros?

18         **THE COURT:**  Any objection?

19         **MR. ROMERO:**  No, Your Honor.

20         **THE COURT:**  All right.  The record will reflect a

21   positive identification of the Defendant.

22   **BY MR. ARMIJO:**

23   Q    Sir, when did you first come into contact with

24   Mr. Cisneros?

25   A    I came in contact with him February 2nd, 2021 around 8:28

1    p.m.

2    Q    Okay.  And could you describe that contact to the Court?

3    A    Yes.  I received a call from our BDOP which is our --

4    that's what they call it, 9-1-1.  And there was a complaint

5    about -- a lot of complaints of a suspicious RV driving around

6    the family camp.  That's where the RVs usually park at.  I got

7    this a dispatch and when I was on scene, I got a positive match

8    for the RV that was described by the complainant.

9         When I made contact, I made contact with Cisneros.

10   Cisneros was very compliant at first.  We asked for license and

11   base credentials as usual.  He provided those and we asked him,

12   why was he yelling and being loud and driving suspiciously.  He

13   stated that he was being chased by somebody and that they were

14   throwing stuff at his RV, possibly radio waves or laser waves

15   towards his vehicle.

16   Q    All right.  Is the RV that you just -- the RV parking lot,

17   is that located on the Kirtland Air Force Base?

18   A    Yes, it is.

19   Q    Okay.  And what did you do after you talked with him and

20   he stated that they were following him and throwing stuff at

21   his RV?

22   A    I proceeded to go and do a sweep around the area just to

23   make sure there was nobody around and then my partner, he --

24   his name was Emory (phonetic) Woods.  He proceeded to do some

25   - take some statements, some information from Mr. Cisneros.

1    And after the walk-through, I -- there was nobody around.

2    Everything looked clear and we told him to go back to his

3    designated spot and he listened.

4    Q    All right.  And the -- were you in uniform?

5    A    Yes, I was.

6    Q    Describe the uniform you were wearing.

7    A    It's going to be an OCP pattern and color with boots and

8    we have patches and a beret signifying our Security Force

9    authority.

10   Q    All right.  And you had mentioned that another individual

11   was with you.  Was that Officer Woods?

12   A    Yes, Officer Woods.

13   Q    Was he also in uniform?

14   A    Yes, he was.

15   Q    Okay.  And so you had left that area at that time.  Did

16   you then have another contact with Mr. Cisneros?

17   A    Yes.  So I came in contact again for a welfare check on

18   the family camp.  It was on February 3rd, 2021 at 12:06 just

19   for the welfare check.  I got dispatched by our Base Command

20   again and I saw this RV again matching the description, the

21   same RV and he was moved from the spot that we left him at.

22           And when I got a little closer to see what's going

23   on, he had thrown everything like -- not everything, most of --

24   a lot of stuff, a lot of cans, sweaters, blankets, empty cans,

25   food cans out of his RV and on the floor.

8

1  Q    Okay.  I'm sorry.  And when you say, "on the floor," do

2  you mean on the street?

3  A    On the street, yes.

4  Q    All right.  And is this still located in the RV parking

5  lot or --

6  A    Yes, it is.

7  Q    Okay.  And who was with you at this time?

8  A    I got dispatched with another patrolman.  His name is

9  going to be Southards (phonetic).  He was with me and he was

10  mostly talking to Cisneros for me.

11  Q    Okay.  And describe that encounter for the Court.

12  A    We arrived on the scene.  The door was opened and he was

13  laying on the couch.  We walked up to it.  We just started to

14  talk to him because he was compliant the first time.  When we

15  talked to him, he was a little mad at first.  He was -- we told

16  him to pick up the stuff and he said, "No, tell them to do it.

17  Tell them, the f-ers to do it."

18          We kept asking him who were "them" just to figure out

19  what was going on.  And we didn't -- he didn't specifically say

20  who they were.  He kind of just kept pointing at stuff.  So we

21  were kind of just trying to tell him to pick up the stuff from

22  out of the pavement -- out of the street and --

23  Q    And describe his nature for the Court at this time.

24  A    He was just a little agitated when we told him to pick up

25  the stuff.  He was just saying, "Tell them -- they wanted this

1    stuff.  So tell them to come pick it up."  We didn't know who

2    was "them" again but we kept just asking him nicely if he can

3    just grab his stuff and put it inside his RV and he complied.

4         But he seemed very angry that he had to do it, very

5    distraught.  We didn't know why again.

6    Q    Okay.  And then what did you do after that?  Did you

7    leave?

8    A    Yeah.  So after he put everything inside his RV, we asked

9    him if he can go back again to his designated spot where the RV

10   is supposed to be at and I got put on a 15-minute check of the

11   RV parking place, just the area just to make sure nothing

12   happens again and --

13   Q    Is that -- I'm sorry.  Is that a 15 -- you said, "a 15-

14   minute check"?

15   A    Yes, 15-minute check.

16   Q    What is that "15-minute check"?

17   A    So it's -- it just -- every time -- every 15 minutes in an

18   hour.  So I go back to the RV parking lot family camp just to

19   verify that nothing was going on, everything was good.  And

20   after 15 minutes of being there, I can depart for 15 minutes

21   and come back to 15 minutes.  That's -- we do that just in case

22   there's a constant problem in a certain place just to have a

23   patrol presence in the area.

24   Q    Is that called a "wellness check"?

25   A    Yes.

1  Q    All right.  So after you left, did you have another

2  contact with the Defendant?

3  A    Yes.  So I came in contact again at 02:00 a.m.  It was --

4  I was -- it was on my -- one of my 15-minute checks.  I saw the

5  RV moving again.  So I let my -- again, my BDOP know and I --

6  they dispatched Sergeant Spears (phonetic) which is going to be

7  our flight chief, our head sergeant.  And Woods and Southards

8  were dispatched as well and Medical and Fire were notified what

9  was going on with this situation and they wanted to come make

10 sure that Cisneros' well-being was good and --

11 Q    Now, were all of you in uniform?

12 A    Yes, we were all in uniform.

13 Q    And were you driving?

14 A    Yes, we were driving.

15 Q    What were you driving?

16 A    I was driving a Ford patrol car.  It has police decals on

17 the side and lights and sirens.

18 Q    All right.  And the other individuals that you mentioned,

19 Spears, Woods, Southards, were they law enforcement?

20 A    Yes, they were.

21 Q    And were they dressed in uniform, law enforcement uniform?

22 A    Yes, they were.

23 Q    Were they driving law enforcement vehicles?

24 A    Yes, they were.

25 Q    All right.  Who else was dispatched to the location at

11

1    that time?

2    A    It was Medical and Fire just to -- Fire usually dispatches

3    with Medical at all times.  It could -- just because we wanted

4    to check on Mr. Cisneros' well-being and mental health, that's

5    why they got dispatched as well.

6    Q    And Medical -- describe the Medical team for the Court.

7    Is that -- are they Federal employees?

8    A    Yes, they work for Kirtland Air Force Base.  They will

9    assist with anything that happens on base as any matter.

10   Q    All right.  And you and all the law enforcement that were

11   there that day were -- are Federal law enforcement; is that

12   correct?

13   A    Correct.

14   Q    Okay.  Now, describe for the Court what you saw.  I think

15   you had said that you had seen Cisneros circling the RV park in

16   his RV.  Explain to the Court what happened next.

17   A    Yes.  So he was circling the RV.  He stopped at the same

18   area that he had thrown the -- all his belongings to the

19   street.  He stopped again right there.  So I tried to approach

20   him in my vehicle and he said, "Get the F away from me."

21        So I immediately waited for backup.  That's our usual

22   procedure just to make sure that we didn't want to approach by

23   himself and since he seemed agitated, I stand by and waited for

24   my other patrolmen.  When they were on the scene, I let

25   Sergeant Spears -- he's my head sergeant.  I let him take

1    control of the situation and he went and made contact with --

2    tried to make contact with Cisneros and when he tried to make

3    contact, Cisneros told him to get the F away from me.  I don't

4    want to talk to nobody.

5            And immediately after -- when he saw Medical and

6    Fire, the lights and sirens, he became very, very erratic and

7    he became to be very agitated saying, "Why you bring them f-ers

8    here," just saying things along the lines of that.  "You're one

9    of them, too," just things like that.

10   Q    And was he speaking to you and Officer Spears?

11   A    Yeah, he was speaking to Officer Spears and he tried to

12   make contact with him through the RV.

13   Q    Okay.  What happened next?

14   A    He fled -- he started just driving the RV.  When we kind

15   of had him in a -- when he was stopped, we kind of tried to

16   walk up to him.  He left and he tried to get away when we tried

17   to give him medical care.   When -- and then our Officer Woods,

18   he goes around and he blocks the parking lot of the RV camp and

19   stops the RV from leaving the RV camp.

20   Q    How did he do that?

21   A    By using his patrol vehicle as a blockade for the entrance

22   of the RV camp.

23   Q    Were his vehicle lights on?

24   A    Yes, they were.  We all had the lights on.

25   Q    At any point, was the siren on?

1   A    Yes, just to initiate -- just so we can -- he can stop, so

2   he knows that he can stop.

3   Q    All right.  So now Officer Woods has blocked the exit from

4   the RV park.  What happened next?

5   A    We tried to initiate a high-risk traffic stop and tried to

6   get him out of the vehicle but it was not working.  He was just

7   angry and back to telling us to just f-ing move.  So our

8   Sergeant Spears, he's negotiator certified.  So he tried to

9   just kind of calm him down and just get him out of the vehicle

10  as safe as possible.

11          Again, we were still trying to just provide medical

12  attention for him saying -- and then he walked up and he just

13  was agitated but we -- he did try to calm down.  So he lowered

14  down his driver's side window about halfway and began speaking

15  to Sergeant Spears.

16  Q    What did he say to Sergeant Spears?

17  A    "Why did you bring those f-ers here?  You're one of them,

18  too.  Leave me -- I just want to get off of here.  I just want

19  to leave.  Just leave me alone.  Move that vehicle in front of

20  me."

21          And then he was kind of just very agitated.  While he

22  was sitting in the driver's side seat, Sergeant Spears, he then

23  got him to calm down a little bit and he turned off his RV all

24  the way.  He turned it off.  But then he -- I think he started

25  talking to himself and then he just became erratic.

14

1       He closed up his driver's side window and just pulled

2  out a screwdriver and just started yelling at us kind of making

3  just flare of movement towards us.  "Why you run them here?"

4  And he was saying stuff.

5       So our Officer Woods -- he called Lieutenant Woods

6  saying, "I want to kill this dude.  What are you doing here?

7  I'm going to go kill them," just things along the lines of

8  that.

9  Q    Now, did he have the screwdriver in his hand?

10  A    Yes, he did.

11  Q    And describe for the Court his motion with the screwdriver

12  and to whom was it directed?

13  A    It was directed -- we were all on the driver's side.  So

14  it was all kind of directed toward all the officers and past

15  him were -- behind us were the Medical.  So he was kind of just

16  doing this type of motion with the screwdriver and he was

17  saying, "I'm going to get -- I'm going to kill them.  Don't let

18  them get close to me.  I'm going to kill them.  Just leave me

19  f-ing alone."

20  Q    Now, you -- as I'm viewing you, you have your hand -- did

21  he have -- okay.  So his hand was closed around the screwdriver

22  and he was -- was he punching towards the --

23  A    Kind of in a throwing motion kind of like --

24  Q    Okay.

25  A    -- like in a forward motion kind of.

 1   Q    All right.  And he was using that as a -- and he was -- at

 2   the same time, did he threaten you or --

 3   A    Yes, he was threatening Officer Woods.  I don't know why

 4   he targeted Officer Woods specifically but he said, "Lieutenant

 5   Woods, I'm going to -- don't get any closer to me.  I'm going

 6   to kill him."

 7            And then he said -- he kind of just looked at Medical

 8   staff and started kind of just saying, "Get the f-ing away from

 9   me.  Get them away from me.  If they get close, I'm going to

10   kill them."

11   Q    Okay.  And what happened after he had made those threats

12   to kill them was thrusting the screwdriver towards him?

13   A    We -- he went to the back and pulled out about -- a

14   camper's knife.  It was about -- a little bit like this size

15   and started doing the same thing with the knife.

16            At that point, Sergeant Spears -- when he -- when we

17   saw -- when he got up and started just yelling at Sergeant

18   Spears, he backed up and we told -- he told all the officers to

19   just clear out of his way and just keep having 360 of security

20   on the RV and we didn't try to make entry because, of course,

21   he had weapons on him and if he would have -- we didn't want to

22   use lethal.  We were still trying to help him out.

23            After he backed up, we let him kind of just cool

24   down.  He was still just yelling, talking to himself.  We just

25   kind of just let him have his space.  After a brief -- after

16

1    I'd say, like, 25 minutes or 30 minutes, he started making

2    dinner or some type of food.  He started -- that's when he

3    pulled out a kitchen knife and just started kind of cutting

4    into a meat and eating.

5            After, he just went and sat down on the driver's side

6    and just started -- in the driver's seat and just started

7    eating.

8    Q    Okay.  And then describe what happened next.

9    A    Sergeant Spears saw that he was eating and kind of just

10   calmed down.  So he re-engaged again and trying to build a

11   rapport.  So he got up to the driver's side window.  He asked

12   if he could roll it down.  He did and he started talking to him

13   again saying, hey, like, what's going on?  Like, how's your

14   family?  What are you eating, just things along the lines.  And

15   Cisneros was calm.

16   Q    Okay.  And did -- what happened after that?

17   A    Cisneros -- they were doing a report and then Sergeant

18   Spears, he kind of got really, really just a good rapport, that

19   he asked Cisneros to open the door for him because he wanted to

20   see how the door looked like and how it opened.  And he --

21   Cisneros went and opened the door and we went and kind of

22   pulled him out of the vehicle.

23   Q    Now, before he opened the door, did you observe Cisneros

24   do anything inside the RV as regarding the door?

25   A    No, not exactly.

17

1 Q    Okay.  Now, you said that you were -- you went in there to

2 -- I'm trying to make sure I understand your testimony.  So

3 when -- eventually Mr. Cisneros, you went in to get him.  Could

4 you describe what you mean by that?

5 A    We opened the driver's side door.  We kind of grabbed one

6 of the hands and kind of pulled him out and he was kind of

7 holding on to the steering wheel kind of jamming his legs in

8 the seat or around there.  He -- it was real hard to kind of

9 pull him out because -- and eventually the weapons and knife

10 was still in the RV and we didn't want him to gain access to it

11 again.

12           So our safest actually was to pull him out of the RV

13 and kind of put him -- detain him and put him in handcuffs.  He

14 was kind of struggling to pull him out.  He was -- we were

15 there for a good 45 minutes trying to get him out of the RV.

16 Q    And so was he resisting?

17 A    Yeah, he was resisting, just --

18 Q    What was he doing with his arms and legs?

19 A    Moving them around trying to not give it to us so we can

20 kind of hold onto his arms and put him in handcuffs was the

21 safest for us for officer safety.

22 Q    Now, eventually what happened?

23 A    We got him out of the RV.  We were trying to, again, put

24 him in handcuffs.  He was moving his arms around saying, "You

25 betrayed me.  You betrayed me, you mother f-ers," things along

18

1    the lines of -- especially to Sergeant Spears since he kind of

2    built a rapport to him.  He was like, "You betrayed me.  You"

3    -- just things along the line.

4           And we eventually kind of put him in handcuffs.

5    Officer Southards then completed a search on him making sure it

6    was good and then Medical kind of screened him making sure he

7    was good.

8    Q    Okay.  Did he have any weapons on him?

9    A    He did not have any weapons on him.

10   Q    All right.  And now what happened after you arrested him?

11   A    Medical screened him.  Medical said that there was a

12   possibility of him being under the influence of narcotics,

13   either prescription or nonprescription because of -- according

14   to Cisneros, he was a hundred percent disability, PTSD.  And we

15   kind of thought that that was the reason why the mental -- the

16   reason why he was acting like that talking to himself.

17          But she said that it was some type of narcotics maybe

18   but she did screen him.  She asked him what date it was, where

19   was he at, just based on the lines and he answered everything

20   correctly.  And the Medical released him to us.  They said that

21   he was good.

22   Q    All right.  And so what happened next?

23   A    I transported him with Southards back into our detention

24   cell.  We got all our paperwork done and we had two officers

25   transport him to Cibola.

19

1  Q   All right.  Now, at some point, did you search the RV?

2  A   Yes.  So we asked him for consent to search the RV because

3  of what Medical said.  They said that he might be on narcotics

4  or something of that.  Maybe it was before earlier in the day

5  or anything along the lines.  So we asked him if he can give us

6  consent and he did give consent and we went and we had our K-9

7  units search the RV.

8       But they -- the K-9 unit -- the actual dog and the

9  handler -- the handler said that it was kind of unsafe for the

10 dog to be in there.  They said there was a lot of trash and

11 torn up stuff.  So she put the dog back in the vehicle and she

12 did her own search and she found -- next to the night stand,

13 around there, she found a pipe of some sort.

14 Q   And did you determine that to be a pipe used for

15 narcotics?

16 A   Yes, it had some type of white substances inside.  So

17 that's why we determined that it was narcotics.

18 Q   All right.  And what else did you find pursuant to that

19 search?

20 A   There was -- the knives, we confiscated the knives.  I

21 have them.  I believe we have pictures of them -- and a

22 screwdriver.

23 Q   Okay.  Where -- do you remember where those were located

24 during the search?

25 A   They were located in the passenger area.  Yeah, I believe

1  the screwdriver was around there as well.

2  Q    Okay.  And you're talking about the passenger area next to

3  the driver's side where he was when he threatened the officers?

4  A    At any point, he can hand-reach them again, those weapons.

5  That's why we were kind of pulling him to the driver's side so

6  he won't go back and try to reach those weapons again.

7  Q    Okay.  And this occurred on February 3rd; is that correct?

8  A    It began on February 2nd and then it ended on February

9  3rd.

10  Q    All right.  Okay.

11           **MR. ARMIJO:**  That's all the questions I have at this

12  time, Your Honor.

13           **THE COURT:**  All right.  Mr. Romero?

14           **MR. ROMERO:**  Thank you, Your Honor.

15                    **CROSS EXAMINATION**

16  **BY MR. ROMERO:**

17  Q    Airman Santiago, I wanted to ask you.  Did you draft the

18  criminal complaint?  I believe it's an eight-paragraph

19  complaint that was filed in this case.

20  A    Yes.  Yes, I did.

21  Q    Okay.  So in that complaint, you made it a point -- it's

22  fairly lengthy.  You made it a point to include in that

23  complaint all of the relevant facts in this case.  Is that

24  fair?

25  A    They told me to do as much as you can but do kind of

21

1    briefly because we were going to do -- to include everything

2    but just do it in a brief manner because we are going to do a

3    -- we do our -- the report is about to be completed.  We have

4    our narrative done and we're going to report it and that

5    narrative has more info than what we can imply in this.

6    Q    Well, let me ask you.  With regard to some of the

7    information in here -- with regard to the allegation that

8    Mr. Cisneros was in possession of drug paraphernalia, you never

9    found and no drugs were actually located either in the pipe or

10   anywhere in the RV, correct?

11   A    We don't have no testers.  So that's why we don't know

12   exactly what's in there but we do have them confiscated so they

13   can be tested at any time.

14   Q    Okay.  At this time in terms of -- for the sake of the

15   judge reviewing the evidence in this case, at this time, you

16   have no evidence that there was any narcotics of any kind,

17   either in the pipe -- what you've described as a pipe or any

18   other narcotics of any kind -- illegal narcotics in the RV; is

19   that correct?

20   A    That's correct, sir.

21   Q    Okay.  And with regard to the allegation -- I think you

22   mentioned a screwdriver.  If I could direct your attention to

23   Paragraph 6 of your complaint -- and let me know when you're

24   there.

25   A    I'm there.

1   Q    Okay.  The -- and I may be mistaken, sir, but the first

2   time that I see any reference to a screwdriver is towards the

3   middle -- a little below the middle section of your complaint

4   and I'm going to quote to you the two sentences that involve

5   the screwdriver.

6             It says as follows, "When Cisneros saw the exit was

7             blocked, he stopped approximately 10 meters short of

8             the blocking patrol cars.  Cisneros locked all his

9             doors and left the engine running.  Spears then told

10            Cisneros to turn the vehicle off and exit the

11            vehicle.  Cisneros, with a screwdriver in hand,

12            stated, 'Fuck you.  Just let me out.'"  Correct?

13  A    Correct.

14  Q    Okay.  So it doesn't say anything here that he brandished

15  or threatened anybody with that screwdriver, does it?

16  A    Yeah, because that's when he became agitated --

17  Q    Okay.

18  A    -- after that.

19  Q    Let me ask you that question again, sir.  And if you could

20  just answer my question.  It doesn't indicate in your --

21  anywhere in your complaint and in the quote that I just read to

22  you that he actually brandished and threatened a specific

23  airman or anybody from the Mental Health team with that

24  screwdriver, does it?

25  A    In that specific sentence, no --

1    Q    Okay.  And --

2    A    -- but it was -- that's right.

3    Q    Okay.  So, in fact, the closest person to him, according

4    to that sentence that I just read to you, was at least 10

5    meters or more away from him, right?

6    A    About, yeah, closer.

7    Q    Okay.  So he wasn't brandishing the screwdriver at anybody

8    and the closest person to him when, according to you, he had

9    the screwdriver in hand was at least 10 meters or more away

10   from him, correct?

11        **MR. ARMIJO:**  I'm going to object to the form of the

12   question.  It misstates the evidence.

13        **MR. ROMERO:**  Can you answer the question unless the

14   judge wants to --

15        **THE COURT:**  Do you want to say -- do you have any

16   response that you want to make to the objection?

17        **MR. ROMERO:**  Your Honor, I think it's relevant.  I

18   don't believe I misstated the evidence.  I'll re-read the quote

19   to the airman if you would like, Your Honor.

20        **THE COURT:**  Well, the objection was that it misstates

21   the evidence.  Of course, the Court's probable cause finding is

22   based on the testimony here in court today, not the criminal

23   complaint.  I think you've established through your questioning

24   that not all of the facts were included in the criminal

25   complaint.

1         But I'm going to sustain the objection because, in

2    fact, the testimony here today was that there were people

3    standing at the door when he was brandishing the screwdriver

4    and so it does misstate the evidence.  If you want to -- I

5    think you've already established that he didn't talk about

6    brandishing the screwdriver in the criminal complaint though.

7         So why don't you rephrase -- if you have any further

8    questions on that issue, rephrase the question to make it clear

9    you're talking about the criminal complaint and not the

10   testimony here today.

11        **MR. ROMERO:**  Okay.

12        **THE COURT:**  But I would suggest you move on.  You

13   have established that he didn't put all the facts in his

14   criminal complaint but, again, the Court's probable cause

15   finding is based on the testimony in court.  Go ahead.

16        **MR. ROMERO:**  All right.  I will move on.  Thank you,

17   Your Honor.

18   **BY MR. ROMERO:**

19   Q    Mr. -- oh, I'm sorry.  Airman Pagan --

20   A    Yes, sir.

21   Q    -- or Santiago.  Them hyphenated last names get to me

22   sometimes.  I apologize.

23        Airman Santiago, in regard to the knife that was seen

24   in possession of Mr. Cisneros, you indicated that for at least

25   an hour, he had been talking to and developing a rapport with,

25

1    I guess, either Sergeant or Airman Spears; is that correct?

2    A    So he first started talking trying to build a rapport.  He

3    became very agitated and he broke away because that's when he

4    got up and he started just moving around -- like, the knife --

5    the screwdriver around.  So we backed up.  We gave him a time

6    to relax.  He ate -- he cooked, he ate and then we -- Sergeant

7    Spears, he got close to the door again and began the -- again,

8    tried to build a rapport with him.

9    Q    Okay.  And I think in your testimony here today you said

10   you even observed him cutting meat with a knife --

11   A    Yes.

12   Q    -- during the time that he was cooking; is that correct?

13   A    Yes, a kitchen knife.

14   Q    Okay.  And you didn't see him at any time, did you -- and

15   it's not contained in your complaint -- brandishing the knife

16   at anybody, did you?

17   A    He did grab the camper's knife, not the kitchen knife but

18   he did not use the kitchen knife to do what you said but the

19   camper's, he did do it.

20   Q    Okay.  I'm sorry.  You said there was a different knife

21   from the knife he was cooking with and cutting meat with that

22   he later obtained possession of?  Is that your testimony here

23   today, sir?

24   A    So there was -- yeah, we have the screwdriver and two

25   knives in our possession.  We tagged the camper knife and the

1   kitchen knife.  We have both of them in our BDOP.

2   Q    Okay.  Well, Airman Santiago, you never saw him and it's

3   not contained in your complaint that I can see --  you can

4   correct me if I'm mistaken -- brandishing the camper knife at

5   anybody, did you?

6   A    Yes, he did.

7   Q    Okay.  And is that in your complaint, sir?

8   A    It's not in my complaint.

9   Q    Okay.  And just, if I could, go back to the screwdriver

10  for one second.  You're aware, are you not, after either from

11  the time you observed him at the scene or in your subsequent

12  inspection of the RV that he used the screwdriver to -- as a

13  substitute key to turn on and off the RV?  Are you aware of

14  that?

15  A    We did not see that because we cannot see where the key

16  would be located at because we're -- the RV is too tall.  So we

17  wouldn't be able to see that.

18  Q    Okay.  Well, did you verify that afterwards?  You have --

19  you found no key to the RV, did you?

20  A    Not that I know of.

21  Q    Okay.  And you indicated that he informed you and I guess

22  that was one of the reasons that you contacted the Mental

23  Health or the Medical team in order to provide services as

24  necessary to Mr. Cisneros.  He advised you that he's a disabled

25  vet, a hundred percent disabled suffering from PTSD; is that

1    correct?

2    A    He was, yes, sir.  He did tell us that.

3    Q    And real quickly, when you tried to block the -- I guess,

4    the exit from the RV park, he stopped; isn't that right?

5    A    He forcibly stopped, yes.

6    Q    Okay.  So he didn't plow through there and hit or even

7    attempt to hit anybody?

8    A    Yes.

9    Q    Correct?

10   A    Correct.

11   Q    And when you guys finally physically grabbed him to arrest

12   him, he didn't -- he was -- he didn't kick or punch anybody,

13   did he?

14   A    He was swinging his arms around.  He could have punched us

15   but we kind of were kind of trying to contain him.  So he kind

16   of didn't have the opportunity to.

17   Q    Okay.

18          MR. ROMERO:  Your Honor, that's all the questions I

19   have.  Thank you.

20          THE COURT:  Okay.  Any redirect?

21          MR. ARMIJO:  No, Your Honor.

22          THE COURT:  All right.  Any reason that Airman

23   Santiago-Pagan can't be excused?

24          MR. ARMIJO:  He may be excused, Your Honor.

25          THE COURT:  All right.

1          **MR. ROMERO:**  No objection.

2          **THE COURT:**  All right.  You are excused.  Your

3    testimony is complete.

4      **(Witness is excused)**

5          **THE COURT:**  Any other witnesses for the Government?

6          **MR. ARMIJO:**  No, Your Honor.

7          **THE COURT:**  Any witnesses for the Defense?

8          **MR. ROMERO:**  No, Your Honor.

9          **THE COURT:**  All right.  Any arguments by either side

10   on the question of probable cause?

11          **MR. ARMIJO:**  Your Honor, very briefly, we've

12   established probable cause for the charges of assault and

13   resisting or impeding certain officers or employees.  The

14   evidence that was presented to the Court this morning showed

15   that Mr. Cisneros in an agitated condition used profanity and

16   threatened them with a screwdriver in his hand in a punching

17   motion.  And then when they tried to gain control of him, he

18   resisted and otherwise impeded their efforts.

19          Within the -- after the search of the RV, law

20   enforcement located a pipe and in Officer Pagan's opinion, it

21   was narcotics.  And, therefore, we've established probable

22   cause for assaulting, resisting or impeding certain officers

23   and possession of drug paraphernalia.  Thank you, Your Honor.

24          **THE COURT:**  All right.  Mr. Romero?

25   *//*

1          **MR. ROMERO:**  Your Honor, I would respectfully dispute

2     both charges.  I don't believe that anybody was within a

3     distance -- within the appropriate distance to Mr. Cisneros

4     where they were in imminent fear of being battered and I don't

5     think the evidence has been established with regard to that

6     issue.

7          I think it's clear, Your Honor, that this was a

8     mental health episode by somebody who is a disabled vet

9     suffering from PTSD.  When he had the actual opportunity to

10    actually batter or assault somebody, he didn't.  He stopped.

11    He stopped his vehicle.

12         And with regard to the drug paraphernalia charge, I

13    would just simply point out, Your Honor, possessing a pipe,

14    just a pipe, is not a crime and there's no evidence that there

15    was narcotics in the pipe.  There's no evidence that there was

16    narcotics in the RV.

17         So the allegation under State law, I guess, that's

18    being assimilated into this Federal case is that he possessed

19    drug paraphernalia and there's just -- not even on a -- I would

20    contend on a probable-cause standard -- any evidence to justify

21    that charge, Your Honor.

22         That's all I have with regard to the probable cause

23    portion of this hearing.

24    //

25    //

1           **THE COURT:**  All right.  Let me just ask Mr. Armijo.

2           So the way that the criminal complaint was charged,

3    there was a charge under 18, United States Code, Section 111

4    and then (b) is cited for the enhanced penalty but the actual

5    statement is assaulting, resisting or impeding certain officers

6    which appears to be an (a)(1) offense but then also I heard

7    testimony about behavior with regard to medical personnel.

8           So what is the Government proceeding under, 18,

9    United States Code, Section 111(a)(1) and the -- and Subsection

10   (b) on enhanced penalties?

11          **MR. ARMIJO:**  Yes, Your Honor.  So the enhanced

12   penalty, the screwdriver, gets us to 18 USC 111(b).  I -- this

13   may have been charged on 111(b).  I think we need to amend by

14   -- in a delineation (a) and (b) although I haven't really done

15   it like that before.  I know the Court may have seen that

16   before but I know we're proceeding on Section 111(b) based on

17   the fact that he had a screwdriver in his hand and then I think

18   there was also testimony that he had a knife in his hand.

19          So I don't mean to confuse things but I think in

20   answer to the Court's question, if we have to amend by

21   interlineation, we would add the (a) but the way it's cited

22   there is 111(b), Your Honor.  I mean, that's obvious.

23          **THE COURT:**  Right.  But then within the offense

24   description is assaulting, resisting or impeding certain

25   officers which would be 111(a)(1).  And I understand that the

1  (b) enhancement has to do with the possession of the

2  screwdriver which the Government scanned the knife or the just

3  the screwdriver?

4          **MR. ARMIJO:**  Well, I believe --

5          **THE COURT:**  There's testimony about a knife as well.

6          **MR. ARMIJO:**  I heard testimony about a knife as well

7  and I think that it would be the knife and the screwdriver

8  based on what we heard today.  And that is correct.  111(a)(1)

9  forcibly assaults, resists, imposes, impedes, intimidates and

10 interferes with the person designated in 114.

11         So if we could amend the criminal complaint to add

12 that charge just on the -- for purposes of making sure I

13 encompass all the possible charges, I would ask permission to

14 do that.

15         **THE COURT:**  Well, and I don't think that the criminal

16 complaint is defective in failing to have (a)(1) but I just

17 wanted to make sure that the intent was -- that the (b) was

18 actually intended to charge and does he have penalty because of

19 the dangerous weapon?

20         **MR. ARMIJO:**  Yes, Your Honor, that is correct.

21         **THE COURT:**  Okay.  So do you want to amend by

22 interlineations and include (a) and (b)?

23         **MR. ARMIJO:**  Yes.

24         **THE COURT:**  Is that what you're thinking?

25         **MR. ARMIJO:**  Yes.  I think I should do that.  I can

1 always revisit this later on as I study it a little bit more

2 but I would seek permission to do that at this point.

3    **THE COURT:**  Mr. Romero, I understand that you object

4 to there being probable cause at all but the Government has

5 moved to amend by interlineation just to reflect more clearly

6 that the area is under 18, United States Code, Section 111(a)

7 and then (b) has to do with the enhanced penalty.

8    So any objection you want to put on the record to

9 amend that by interlineation other than, obviously, that you

10 object to probable cause as it is?

11    **MR. ROMERO:**  Your Honor, just to preserve my client's

12 rights if -- I will stand on -- for the record, on an objection

13 to -- obviously, to probable cause as indicated earlier and

14 also for the -- as to the proposed interlineation, Your Honor.

15    **THE COURT:**  All right.  Based on the witness'

16 testimony, I find probable cause to support the charges in the

17 criminal complaint and I'm also going to allow the Government

18 to amend by interlineation just to make clear the assaulting,

19 resisting or impeding certain officers is a charge brought

20 pursuant to 18, United States Code, Section 111(a) and (b), (b)

21 being the statutory enhancement based on the alleged use of a

22 deadly or dangerous weapon.  There was testimony regarding both

23 the screwdriver and the camper's knife.

24    All right.  Having found probable cause to support

25 the charges and granting the motion to amend by interlineation

33

1    and to reflect both (a) and (b) of 111, let's proceed on to

2    detention.

3              Let me hear first from the Government and then I'll

4    hear from Mr. Romero.

5              **MR. ARMIJO:**  Thank you, Your Honor.  The Defendant's

6    criminal history as reflected in the Pretrial Service Report

7    indicates several things.  Mr. Cisneros has an extensive

8    criminal history which relates to law enforcement.

9              One of the charges that I find remarkable -- and let

10   me just find it here in the report, Your Honor -- is the --

11   back in 2004 -- and this is reflected in the report -- he was

12   charged with aggravated assault.  Now, the warrant was -- or

13   the warrant was issued in that case and then the case was

14   dismissed with prejudice.  I want that noted for the Court.

15   But the point is that he was arrested in 2004 for aggravated

16   assault.

17             His criminal history also reflects numerous failures

18   to appear.  We start in 1987 -- of course, this is a while ago.

19   He had a failure to appear with respect to a case out of

20   El Paso County courthouse, Docket Number 1987-T8794.  And in

21   1993, he had a probation violation with respect to a case,

22   Docket Number 1993-T14987.

23             Now, obviously, the charges there are operating a

24   vehicle without insurance, failure to display lights and no

25   seatbelts, driving while intoxicated but the point I'm making

1   is that he violated probation on seemingly small charges or

2   misdemeanor charges.

3            Then in 1994, he had a probation revocation stemming

4   from an incident out of Colorado.  Probation -- that revocation

5   was in '97 and then in '97, there was a failure to appear

6   issued in that case and that's Docket Number 1994-CR1206.

7            He had another failure to appear and a bench warrant

8   was issued in 1996 for another case out of Colorado at Docket

9   Number 1996-T8663.

10           He had another failure to appear out of Colorado.

11  Failure to appear in 1997, bench warrant issued and ultimately

12  that case was dismissed.  And this was in Docket Number

13  1997-M6028.

14           And then he had another failure to appear out of

15  Colorado and in this case a misdemeanor offense.  It looks like

16  bicycle equipment violation, no headlight.  But he failed to

17  appear on a bench warrant.

18           So I think what was demonstrated here is some of

19  these charges are misdemeanors, obviously, but he has a

20  disrespect for the Court.  He's not appearing when he's

21  supposed to.

22           He also has some convictions.  One -- the most recent

23  that I see here was in 2017.  It was possession of a controlled

24  substance and possession of drug paraphernalia and he was found

25  guilty in 2017.

1          Now, I note that I don't see, other than the

2   aggravated assault, very much as it relates to dangerousness

3   but I would argue and I'd agree with the Pretrial Services

4   Report that getting him in court is going to be a problem if

5   he's released.  Thank you, Your Honor.

6          **THE COURT:**  Mr. Romero, let me hear from you.  My

7   concern -- I have a concern, obviously, about mental health

8   issues and a need for treatment but those issues are not going

9   to be addressed as adequately in custody as they would in the

10  community.  But I do have a concern about flight risk and

11  dangerousness and I'm not sure what housing options are

12  available for the Defendant at this point.

13         So, Mr. Cisneros, one thing I'd like to have you

14  address is -- I know that sometimes there are programs

15  available for both substance abuse and mental health treatment

16  through the VA.  Sometimes there's housing options.

17         I don't know if you've even had time to look into

18  that but I am concerned about where Mr. Cisneros would live if

19  I were to release him and also, of course, whether he would

20  show up and whether he poses a danger to the community given

21  the offense conduct here and some of the issues that I see in

22  his criminal history including a history of substance abuse

23  problems.  So go ahead.

24  //

25  //

36

1          **MR. ROMERO:**  Your Honor, Mr. Cisneros is 59 years

2    old.  I don't think he's a significant flight risk.  He's lived

3    his whole life either in -- mostly in Colorado and the last

4    four years in New Mexico.  He has a doctor who he treats with

5    through the VA in Santa Fe.  The name is Jennifer Comeaux

6    (phonetic).  I have a call into her but I have not heard back

7    from her.  I picked up this case on Friday, Your Honor, as you

8    know.

9          The -- he has lived in New Mexico for the past four

10   years.  He's lived in and out of either apartment complexes or

11   his RV, most recently out of his RV.  He's -- according to him,

12   he's a hundred percent disabled and receives a Veterans'

13   disability retirement pension.  So he does have income.

14         There are various Veterans' programs that we could

15   look into for him but, obviously, I don't think the pretrial

16   detention at Cibola County, as you've kind of alluded to, Your

17   Honor, is a substitute for proper mental health treatment which

18   is obviously based on the description of what the Court heard.

19   With regard to what happened here, basically indicates that we

20   have more of a person who was having a mental health episode as

21   opposed to a person who was intentionally trying to hurt

22   anyone.

23         And he, in fact, didn't hurt anyone.  As you heard,

24   there was -- it was this one-hour rapport-building. He actually

25   was cooking during this timeframe.  I mean, this just does not

1    indicate somebody I would contend that is a significant risk of

2    danger to the community.

3            And I also would not -- would argue that he's not a

4    significant or serious flight risk because you can't keep him

5    out of New Mexico or out of Colorado.  He's been in those two

6    places other than the time in the military his whole life.

7            And, Your Honor, as a substitute, what I would

8    recommend is perhaps placement in a halfway house while myself

9    and my paralegal can attempt to get him proper mental health

10   treatment, connect with Dr. Comeaux, his doctor, and I'm told

11   he's on a variety of prescription meds, in particular

12   Wellbutrin for some serious depression PTSD-related condition,

13   Your Honor.

14           But I think what we have here, honestly, again, in my

15   opinion is detaining somebody because of his mental health

16   condition.  I understand the concern of the Government and the

17   concern of this Court.

18           **THE COURT:**  That would not be a -- if I were to

19   detain him, it wouldn't be because of mental health problems.

20           **MR. ROMERO:**  No, I understand that, Your Honor, but

21   it's kind of the root cause and all I'm alleging here or

22   stating is that I don't believe he poses a serious risk of

23   danger or a serious risk of flight based on aged either

24   dismissed or subsequently resolved State charges out of

25   Colorado.

1          **THE COURT:**  Well, the problem with the halfway house

2   is while it's possible, as you are proffering to the Court,

3   that the episode that gave rise to these charges had to do with

4   mental health issues, it's also possible it had to do with

5   substance abuse.  It's unclear but the bottom line is that

6   La Pasada Halfway House is a place where many people reside.

7          And for whatever reason, the Defendant had the belief

8   that people were chasing him, that things were happening and it

9   doesn't seem -- and then what ended up happening was a two-day

10  ordeal, the last of which we heard testimony about resulted in

11  him brandishing a screwdriver and a weapon at multiple law

12  enforcement officers and then medical personnel trying to help

13  him.

14         And the problem is that putting him at La Pasada is

15  probably not conducive to his own safety or the safety of the

16  other people there and I don't think that that's necessarily an

17  appropriate placement.  And so what I want to know is what type

18  of placement we could have.

19         It sounds like you just don't -- haven't had enough

20  time to contact his doctor, to talk to his doctor but she might

21  very well say putting him in a closed, ordered halfway house

22  with other residents in a dorm room with him is just not

23  conducive to his need if he has PTSD.

24         So, I mean, I have real concern about whether

25  La Pasada would be more of a trigger and would just give rise

1    to him feeling the need to flee from La Pasada much as he

2    wanted to flee this RV park at a time when he thought people

3    were after him.

4           **MR. ROMERO:**  Your Honor, he has an RV.  He can go to

5    an RV park for a limited period of time until we can get him

6    into a more structured environment.  He has the wherewithal

7    based on his pension, I understand, to obtain housing and he's

8    been living peacefully for the most part out of an RV park

9    other than this incident that I'm aware of and that there's any

10   record of -- in an RV park -- different RV parks for the last

11   three to four years.

12          **THE COURT:**  Okay.  So this is what I'm going to do.

13   Right now based on what I've heard and this Pretrial Services

14   Report and his criminal history, I don't believe that a halfway

15   house is an appropriate placement for Mr. Cisneros.  He poses

16   some risk of flight and danger that may be mitigated by

17   adequate conditions of release that I just haven't heard a -- I

18   haven't heard a plan of release at this point in time that

19   would adequately mitigate a risk of danger and flight that he

20   poses.

21          I'm going to continue -- I'm going to enter a

22   detention order but I'm going to continue this for a status

23   conference to review conditions of release.  I can either

24   continue it until later in the week or I can continue it to

25   sometime next week.  And I will -- after I'm done, I'll give

40

1  you both an opportunity to weigh in.

2           But I'm going to ask that Pretrial Services get with

3  Mr. Romero, see what we can figure out about his mental health

4  needs and also whether there are any programs that would be

5  available, whether there is a place that he can reside, either

6  an apartment if you can propose one with more stringent

7  substance abuse and mental health counseling availability which

8  is why I recommended looking into one of these VA programs that

9  might be available.

10          Sometimes there's even a program -- there are more

11 intensive outpatient mental health and substance abuse

12 counseling programs but there are also some housing options

13 although it sounds like he may not need that given that he has

14 an RV.

15          But what I want you-all to address is whether there

16 is some plan that can be put in place to allow him to reside in

17 the community, not in a halfway house.  That's not an

18 appropriate placement based on what I've heard -- and also some

19 more intensive substance abuse evaluation and treatment

20 preferably through the VA.

21          So, Mr. Romero, it requires a little bit of work on

22 your part to, obviously, get through to this doctor and then

23 figure out what's available through the VA and if not, propose

24 something to the Court.  Do you want me to set this for later

25 in the week to review conditions or early next week?

1           **MR. ROMERO:**  I think, Your Honor, to do the due

2     diligence, I would ask for early next week.  That would give me

3     time to get together with Pretrial Services.  I know

4     Mr. Cisneros did inform me of a program called "VIC."  I called

5     them on Friday, Veteran's Integration Center.  That's a program

6     he had mentioned to me that I guess he's worked with before.

7           But it's going to take some work between now and the

8     time we can put something together and I don't know --

9     obviously, Mr. Cisneros is not in a position to afford a mental

10    health eval or a substance abuse eval that the Court may be

11    interested in doing and I would have to coordinate that with,

12    perhaps, Pretrial Services.

13          **THE COURT:**  Oh, yeah.  No, I'm not suggesting he have

14    that done prior to me considering fashioning conditions.  What

15    I'm suggesting is that you look into the availability of that

16    through the VA and this integration program may be something

17    that's offered but either way, I mean, whether -- even if

18    there's not something available through the VA, we can, through

19    Pretrial Services, provide intensive treatment.

20          But, obviously, going through the VA is better

21    because they address PTSD-related issues for veterans and

22    substance abuse issues specific to veterans with more frequency

23    than some of the treatment programs we have available to people

24    on release.

25          So that's why I'm suggesting that you go through the

42

1    VA as a first option.  But, certainly, if there's -- I just

2    want to hear a proposal that's not a halfway house because the

3    halfway house is inappropriate.

4            Mr. Cisneros, just for your understanding here, even

5    if I had granted your attorney's request to release you to a

6    halfway house, you wouldn't be released today because they

7    require a 14-day quarantine period.  So you wouldn't be getting

8    out of custody for a couple weeks anyway.

9            What I'm hoping for is that in the meantime between

10   now and early next week, we can come up with some option that

11   would allow me to release you into the community into some sort

12   of structure that will adequately ensure that you show up in

13   court and that the risk of danger is sufficiently reduced.

14           At this point, I don't have options available.  I'm

15   hoping those will become available.  If they do between now and

16   next week when we come back to this hearing, then you may very

17   well get released before you would have been released to

18   La Pasada anyway had I granted that request.

19           So, Ms. Day, will you be the one that Mr. Romero

20   should contact about any proposed release options or is there a

21   different Pretrial -- Probation officer?

22           **MR. SPEAKER:**  Are you talking to me?

23           **THE COURT:**  No, I'm talking to Ms. Day.

24           **U.S. PRETRIAL SERVICES OFFICER DAY:**  Your Honor, his

25   Pretrial Services officer that is coordinating will be Anthony

43

1   Carter --

2          **THE COURT:**  Okay.

3          **U.S. PRETRIAL SERVICES OFFICER DAY:**  -- and Anthony

4   has already began the process of speaking with a case manager

5   through the VA and staffing with our other officers who are

6   very familiar.  And he says -- they say that it will be

7   Mr. Romero that will need to contact the various VA programs.

8          There is the STAR program and that's for substance

9   abuse.  And then there's the PACE program and that's for mental

10  health.  And then there's, of course, the other two programs

11  for integration and everything.  That's an application and has

12  to be accepted into.  So it's a process but, hopefully, we can

13  get him into some type of program.

14         **THE COURT:**  Okay.  And in your experience, if I were

15  to reset this for next Monday or Tuesday, is that sufficient

16  time?  I know sometimes things don't move as quickly as we

17  would like but do you think that's sufficient time for

18  Mr. Romero to be able to get the VA to start looking into this

19  issue and maybe get us an answer about program availability?

20         **U.S. PRETRIAL SERVICES OFFICER DAY:**  We will --

21  definitely within a week.  There definitely should be an answer

22  regarding the availability and possible acceptance and

23  admission --

24         **THE COURT:**  Okay.  So --

25         **U.S. PRETRIAL SERVICES OFFICER DAY:**  -- that will

44

1  give you some idea.

2        **THE COURT:**  Okay.  So, Mr. Romero, just get in touch

3  with Anthony Carter if you have any issues about or questions

4  about what case worker he got in touch with or need assistance

5  from Pretrial.

6        Now, I'm -- Monday is a holiday.  So I guess we won't

7  be having this hearing on Monday and then Tuesdays there's a

8  new duty judge.

9        I'm not sure, Liz, if it makes sense to put this at

10  the end of the duty docket and then I come on or if we should

11  look for an afternoon.  Probably we should look for an

12  afternoon opening from Cibola.

13        **THE CLERK:**  Yes, I'll look into that right now,

14  Judge.

15        **THE COURT:**  Okay.  All right.  So we're going to come

16  back next week some afternoon.  I can't tell you exactly which

17  afternoon because the District Court judges have the Cibola

18  Zoom rooms in the afternoon.  And so we're going to have to get

19  in touch with their chambers and see if we can schedule

20  something.

21        But you'll hear, Mr. Romero and Mr. Armijo, from the

22  clerk's office about when the hearing is going to be set next

23  week.

24        And then, Mr. Cisneros, your attorney will advise you

25  as well.

45

1          Okay.  So in the -- presently I'm detaining you

2   because I believe that you pose a risk of flight and a risk of

3   danger to the community that at present I don't have adequate

4   ability to mitigate.  We're going to come back for a hearing.

5   I just note that there is a history of substance abuse on your

6   record.  Of course, there are many prior failures to appear in

7   court but those are quite old.

8          There's at least some indication in the criminal

9   history of prior attempts to evade law enforcement and there

10  appear to be at least one prior violation of probation and

11  parole.  That said, we'll take this issue up again and I'll

12  review conditions next week.

13         All right.  Anything further at this time?

14         **MR. ROMERO:**  Yes, Your Honor.  If I may, I didn't

15  mean to jump in front of Rumaldo but my -- I just remembered my

16  client is extremely concerned about being able to get his RV

17  back and that's his home essentially and I wanted to see if I

18  could get a phone number or somebody to contact at the base for

19  that, his personal property and his RV.  Is that --

20         **MR. SANTIAGO-PAGAN:**  Yes.  So we -- contact Tony in

21  Albuquerque.  I can give you the information, like I said to

22  the other attorney.

23         **MR. ROMERO:**  Okay.

24         **MR. SANTIAGO-PAGAN:**  And that's where they towed it

25  at.  That's where it's at.  That's where it's been sitting in

46

1   the -- because somebody towed me.  I don't have the information

2   right now but I can get that for you.

3           **MR. ROMERO:**  Okay.  Thank you, Your Honor.  I

4   apologize.  I just needed to get that information.

5           **THE COURT:**  And, Mr. Armijo, if you wouldn't mind

6   getting that information from Santiago-Pagan and then giving it

7   to Mr. Romero hopefully by the end of today.

8           **MR. ARMIJO:**  Yes, Your Honor.

9           **THE COURT:**  All right.  Anything further from the

10  Government?

11          **MR. ARMIJO:**  Nothing further, Your Honor.

12          **THE COURT:**  Mr. Romero?

13          **MR. ROMERO:**  No, Your Honor.

14          **THE COURT:**  All right.  Mr. Cisneros, I will see you

15  next week at some point to review conditions of release and

16  hopefully we'll hear a plan for release.

17          Okay.  We're in recess on this matter at this time.

18          **MR. ARMIJO:**  Thank you, Judge.

19          **MR. ROMERO:**  Thank you, Judge.

20      **(Proceeding adjourned at 1:07 p.m.)**

21

22

23

24

25

## CERTIFICATION

       I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

<u>July 23, 2021</u>

       Signed                                 Dated

*TONI HUDSON, TRANSCRIBER*